UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MATTHEW ALAN SCHROCK, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00601-SEB-CSW |
| | ) | |
| INDIANA DEPARTMENT OF CORRECTIONS, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON
FEDERAL CLAIMS AND DISMISSING SUPPLEMENTAL STATE LAW CLAIMS**

Plaintiff Matthew Alan Schrock, Jr. brings this civil rights action against Defendants based on allegations that they (1) maintained, carried out, and/or implemented official policies and practices that discouraged continuity of care, and failed to provide treatment for chronically mentally ill inmates in part to reduce the cost of care, and (2) denied access to a program or activity on the basis of a disability. Defendants Wexford Health Services, LLC ("Wexford"), Indiana Department of Correction ("IDOC"), and GEO Group Inc. ("GEO") have moved for summary judgment, dkts. [100], [103], and [106] (respectively). For the reasons below, those motions are **GRANTED**.

## I.
### Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir.

1

2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Schrock and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A.  The Parties

Mr. Schrock has a long history of mental illness, having been in and out of mental hospitals since he was a juvenile. Dkt. 68 at 3−4, ¶¶ 14-15 (Fourth Amended Complaint). Mr. Schrock has been incarcerated within the IDOC since August of 2018, and was housed at the Annex at New Castle Correctional Facility ("New Castle") at all times relevant to this case. *Id*. at 3, ¶9.

Defendant IDOC is responsible for housing inmates in the state of Indiana, including individuals who suffer from mental and physical disabilities. *Id*. at 3, ¶ 10.

Defendant GEO is a private contracting corporation that operates New Castle under contract with the IDOC. *Id*. at 3, ¶ 11. Although GEO is responsible for the correctional administration and operation of New Castle through its contract with IDOC, it is not responsible for the medical or mental healthcare of the inmates housed there. Dkt. 105-3 at ¶ 19. Per the contract between IDOC and GEO (the contractor), "[t]he Contractor will not be responsible for the provision of . . . mental health service . . . However, the Contractor will ensure a cooperative environment and unified relationship with established providers of the . . . mental health service." Dkt. 105-5 at 2(h).

Defendant Wexford is a private corporation that contracted with the IDOC to provide health care to inmates housed within the IDOC. *Id*. at 3, ¶ 12. Wexford's contract to provide healthcare services to the IDOC was active and in effect in 2020. Dkt. 102-4 at 2, ¶ 4. Their contract ended on June 30, 2021, and non-party Centurion Health of Indiana, LLC, became the new healthcare services provider for the IDOC on July 1, 2021. *Id*. at 3, ¶ 5.

### B.  Mr. Schrock's Medical History and Care Under Wexford

The Court summarizes Wexford's treatment of Mr. Schrock, as reflected in Mr. Schrock's medical records, as follows (dates of in-person appointments with Wexford providers in bold):

- **April 9, 2019:** While housed at Westville Correctional Facility[1], Mr. Schrock was classified by a nurse under "Disability Code: A" ("No Disability. Offender is

---

[1] Although this case focuses on Mr. Schrock's treatment while he was housed at New Castle, the Court recounts his treatment at Westville given his allegation that Wexford failed to ensure continuity of care for its patients within IDOC.

capable of performing activities of daily living"); "Medical Code: A" ("[f]ree of illness or injury, and physical impairment"); and "Mental Status Classification BH Code: D" ("[p]sychiatric disorder that causes some impairment and requires frequent psychiatric and/or psychological services and/or the individual has a history of a serious suicide attempt while in a correctional setting. Services needed may be routine and/or unplanned in nature and may involve mental health monitoring"). Dkt. 102-1 at 1-4.

- **October 7 and 14, 2020:** While in the restrictive housing unit ("RHU") Mr. Schrock was seen twice by a mental health provider, and both times he told her that he had no mental health issues to note. *Id.* at 22, 54.

- October 20, 2020: (telemedicine) While incarcerated at Westville, Mr. Schrock was seen by psychiatrist Barbara Eichman to monitor his medication. Dr. Eichman continued Mr. Schrock's prescriptions for Prozac and Remeron based on his report to her that they were helping his anxiety and depression.

- **October 21, 2020:** Mr. Schrock was seen by a mental health provider for RHU rounds at cell front. He complained about treatment by [mental health] and custody staff. *Id.* at 74-105.

- **October 29, 2020:** Mr. Schrock was seen for an inter-facility transfer screen conducted by Brittany A. Torres, MHP after his transfer from Westville Correctional Facility to New Castle. Ms. Torres noted that Mr. Schrock had active diagnoses of Depression and Antisocial Personality Disorder for which he was prescribed Prozac and Remeron. Mr. Schrock self-reported suffering from Post-Traumatic Stress Disorder ("PTSD"), and Ms. Torres noted that Mr. Schrock had

4

previous diagnoses of an unspecified personality disorder, major depressive disorder, bipolar disorder, conduct disorder, impulse control, intermittent explosive disorder, and Attention-Deficit/Hyperactivity Disorder (ADHD). She determined that Mr. Schrock should remain as a Code D, and that he would be scheduled to be seen by a mental health provider every 90 days or upon his request. *Id*. at 106-18.

- **November 13, 2020:** Ms. Torres saw Mr. Schrock for a 14-day follow-up. Mr. Schrock discussed childhood sexual abuse and being in the system for 16 years, where he experienced problems due to his race. He reported that his psychotropic medications helped him with his anxiety and sleep, but that the prison setting triggered his mental health issues. Mr. Schrock reported no suicidal or homicidal ideations, and Ms. Torres noted that he had positive coping skills. Ms. Torres determined that Mr. Schrock should receive individual therapy from a mental health provider every 90 days to help treat his PTSD and anxiety. *Id*. at 119-27.

- December 19, 2020: Mr. Schrock filed a healthcare request form (HCRF) 502638 for mental health treatment stating, "My anxiety has been bothering me badly the past couple weeks. And I haven't been able to eat anything, really for the past week." Health Care staff responded on December 24, that an appointment was scheduled for December 28, and he would be seen then. *Id*. at 135-37.

- **December 21, 2020:** Mr. Schrock had a follow-up medication management appointment with nurse practitioner Celeste Johnson. Mr. Schrock reported his mood as overall variable, with increased depression and anxiety beginning before his transfer to New Castle. Nurse Johnson increased the dosage of Mr. Schrock's Remeron, and he agreed with the plan. *Id*. at 130-34.

- **December 28, 2020:** Mr. Schrock had a therapy appointment with Ms. Torres for the appointment related to his HCRF #502638. Mr. Schrock reported increased anxiety and difficulty managing emotional responses to custody staff. Ms. Torres attributed his anxiety to his new environment and noted she would monitor Mr. Schrock's status per policy or a request to be seen by him. *Id*. at 138-40.

- **January 27, 2021:** Mr. Schrock met with Ms. Torres. Ms. Torres had received a call from Mr. Schrock's attorney requesting his mental health records, and she explained the steps Mr. Schrock would need to take to provide his consent. *Id*. at 141-42.

- **February 12, 2021:** Mr. Schrock saw Ms. Torres for therapy. Mr. Schrock expressed his anger towards IDOC claiming that "they are hiding evidence" and also reported increased paranoia and anxiety that causes him to mostly remain in his cell. Ms. Torres reviewed coping skills and provided Mr. Schrock with a trauma workbook to complete before their next session. *Id*. at 143-45.

- **February 15, 2021:** Mr. Schrock had a medication management appointment with Nurse Johnson. Because Mr. Schrock reported overall mood stability and denied depression, anxiety, suicidal and homicidal ideations, auditory or visual hallucinations, and paranoia, they agreed that Mr. Schrock would continue with his current prescriptions of Prozac and Remeron. *Id*. at 146-50.

- **March 5, 2021:** Mr. Schrock was seen by Kyleigh J. Ingalls, MHP for a mental health status exam in the RHU. Mr. Schrock denied any mental health concerns or concerns about his placement in restrictive housing. Ms. Ingalls determined that Mr. Schrock did not meet Serious Mental Illness criteria at this time but was still

considered to qualify as a "D mental health code" given his depression. *Id.* at 151-57.

- **March 7, 2021:** Mr. Schrock was seen by Nurse Marissa Runyan for medication non-compliance based on reports that Mr. Schrock was refusing to take his prescribed medication. When Nurse Runyan told Mr. Schrock that the nurse practitioner would be told of his non-compliance, Mr. Schrock began yelling and threatening staff. *Id.* at 158-59.

- **March 9, 2021:** Mr. Schrock was seen by Nurse Johnson for a medication management appointment. Nurse Johnson had been informed of Mr. Schrock's suspected diversion activity, and she warned him that if it happened again his medication would be discontinued. On this same day, Mr. Schrock was seen by Ms. Ingalls. He reported feeling "anxious," and they discussed coping skills to manage his PTSD symptoms. *Id.* at 160-93.

- **March 10, 2021:** Nurse Runyan noted in Mr. Schrock's medical notes that he refused to remove the sheet from his cell window so medical staff could observe him take his medicine, so none was provided. She informed Mr. Schrock of the detrimental impact of refusing his medication. While a refusal and release from responsibility for medical, surgical, psychiatric, and other treatment form was filled out, it was not signed by Mr. Schrock. *Id.* at 194-96.

- **March 11, 2021:** A refusal and release from responsibility for medical, surgical, psychiatric, and other treatment form was filled out but not signed by Mr. Schrock. *Id.* at 197.

- **March 22, 2021:** Ms. Ingalls reassessed, evaluated, and adjusted Mr. Schrock's individualized health plan. She noted that Mr. Schrock identified struggling with coping with environmental triggers but had positive coping skills to deal with them. She further noted that because Mr. Schrock had been released from the RHU the week before, "the restrictive housing portion of the [treatment] plan was resolved." Mr. Schrock remained a "D" mental health code. *Id*. at 198 – 201.

- **March 26, 2021:** Ms. Torres saw Mr. Schrock for therapy. They added a goal to his treatment plan:  to "[comply] with all prescribed psychotropic medication." Mr. Schrock reported increased symptoms of paranoia and hypervigilance. Mr. Schrock had been completing his trauma management workbook and told Ms. Torres that he had been gaining insight on how past traumas continued to affect his behavior. They reviewed coping skills (primarily breathing techniques), and he denied any suicidal ideation. Mr. Schrock acknowledged that he struggles to comply with direct orders on occasion. Ms. Torres concluded that he was making progress in his treatment plan. *Id*. at 202-07.

- **April 29, 2021:** After being placed back in segregation for a use of force incident, Mr. Schrock was seen by Nurse Erica Jones for an Initial Restrictive Housing Review visit. He was "[p]laced in seg[regation] for use of force after refusing to cuff up." Mr. Schrock seemed "a little flat/depressed" but denied suicidal or homicidal ideations. He reported feeling helpless and hopeless with regard to the future. *Id*. at 208-11.

- **April 30, 2021:** Mr. Schrock was seen by Ms. Torres for a review assessment of his mental health action plan. Mr. Schrock noted increased depression symptoms

that had worsened since his placement in restrictive housing, but he did not present with symptoms consistent with depression, anxiety, or a thought disorder. Based on their encounter, Ms. Torres did not think he met the criteria for a serious mental illness and noted that Mr. Schrock would continue to be monitored. Ms. Torres also had a therapy session with Mr. Schrock that day.  Mr. Schrock reported a low mood and neglect of activities of daily living, but Ms. Torres observed that he was groomed and had recently showered. Mr. Schrock told Ms. Torres that his placement in RHU was dehumanizing and worsened his depression, and she provided him with a depression management workbook to work through. Because he denied suicidal and homicidal ideation and his mental status exam was within normal limits, Ms. Torres concluded that they would continue to monitor him per their policy or upon his request.  *Id*. at 212-21.

- **May 3, 2021:** Mr. Schrock was seen by Ms. Torres for an RHU mental health appointment. No mental health concerns were reported. *Id*. at 222-54.

- **May 10, 2021:** Mr. Schrock was seen by Ms. Torres in the RHU for a mental health appointment. Mr. Schrock "reported no concerns at this time" and there were "[n]o observed signs of depression, anxiety, or formal thought [disorder]." *Id*. at 255-87.

- **May 17, 2021:** Mr. Schrock was seen by Nurse Johnson for a medication management appointment. At this appointment, Mr. Schrock reported "[an] overall stable mood . . . [denying] significant depression or anxiety [symptoms] at current." He mentioned that he was working through his PTSD from childhood with a therapist. He denied suffering from hallucinations or paranoia as well as suicidal/homicidal ideations. Mr. Schrock reported having an adequate appetite and

9

sleeping eight to ten hours a night. He was taking his medication as prescribed, so Nurse Jones continued his prescription and discussed potential side effects. *Id*. at 288-92.

- **May 21, 2021:** After Mr. Shrock's May 10 release from the RHU, he was seen by Ms. Torres, to evaluate his treatment plan. She concluded it was appropriate to continue characterizing him as a "D" mental health code and to continue with therapy every 90 days. *Id*. at 293-97.

- June 7, 2021: Mr. Schrock was scheduled to be seen by Ms. Torres, but the appointment was canceled due to issues at the facility. *Id*. at 298-99.

As mentioned, GEO was not directly responsible for providing Mr. Schrock with mental health care. GEO staff's role was limited to coordinating care, which it largely did by reviewing grievances. Of the seven grievances filed by Mr. Schrock while he was at New Castle, only one related to his mental health treatment. Dkt. 105-4. The grievance specialist denied Mr. Schrock's grievance on the basis that he received mental health care on a regular basis, and that any disruptions to Mr. Schrock's medications were caused by his refusal to take them. *Id.*

### C. Mr. Schrock's Disputes Regarding His Mental Health Care

Mr. Schrock disputes the adequacy of his mental health care while he was under Wexford's care at New Castle. He asserts that Wexford and GEO staff improperly ignored Dr. Carrie Dixon's 2019 evaluation of Mr. Schrock in which she diagnosed him with PTSD. Dkt. 114-1 at ¶ 3; dkt. 114-2. That report had been court-ordered to determine if Mr. Schrock was competent to stand trial. Dkt. 114-2. Mr. Schrock testified that Wexford was motivated to cut costs and enhance profits by not conducting diagnostic evaluations so that Wexford's employees could maintain that his

diagnoses were not active. Dkt. 102-5 at 132-33 (130-31). [2] Mr. Schrock testified that Wexford staff failed to provide adequate therapy and forced him to choose between his medications in order to save money. *Id.* at 131-32 (129-30).

Mr. Schrock attested that Defendants intentionally ignored his PTSD so that he would not be labeled as "seriously mentally ill." Dkt. 114-1 at ¶ 3. He believes that by doing so, Defendants avoided having to comply with the terms of the settlement agreement reached in *Indiana Protection and Advocacy Services Commission, et al., v. Commissioner, Indiana Department of Correction*, case no. 1:08-cv-1317-TWP-MJD. *Id.* (the Court hereinafter refers to the case as "*IPAS*" and the settlement agreement as "IPAS Agreement"). The IPAS Agreement prohibited IDOC from housing seriously mentally ill inmates in segregation/restrictive housing for more than 30 days without taking certain steps to ensure the inmate's safety. *See IPAS*, no: 1:08-cv-1317, dkt. 496 at 4-5, 10-12. Mr. Schrock believed that Wexford intentionally failed to do proper diagnostic testing to confirm that he had serious mental illness. Dkt. 102-5 at 146-47 (144-45). He testified that by not doing this testing, any time he got a conduct report, it was attributed to him being a bad person rather than a result of a mental health issue. *Id.*

Mr. Schrock also testified that Wexford, IDOC, and GEO failed to communicate with one another to provide care to inmates with serious mental illness. Dkt. 102-5 at 104 (102).

Mr. Schrock testified that his mental illness has affected his daily life because he sometimes cannot get out of bed; he sometimes refuses to shower; and he sometimes has difficulty articulating his thoughts. *Id.* at 104-05 (102-03). Further, he has difficulty controlling his emotions and fears he may harm someone, so he avoids other people. *Id.* at 106-07 (104-05).

---

[2] When citing to Mr. Schrock's deposition, the Court first cites to the page number of the PDF, and then to the page of the deposition itself.

**III.**
**Discussion**

Mr. Schrock believes that Defendant IDOC failed to provide proper mental health treatment for Mr. Schrock in violation of the Rehabilitation Act. Dkt. 68 at 18, ¶ 69. Specifically, he argues that he has a qualifying disability under the Americans with Disabilities Act (ADA) and was denied access, by IDOC, to a program or activity solely on the basis of such disability. Dkt. 102-5 at 182 (180).

He further asserts *Monell* claims against Defendants Wexford and GEO[3] for having maintained a policy, procedure or custom that resulted in the failure to provide proper mental health treatment and for their respective deliberate indifference in the failure to train or supervise their employees as to the implementation of policies for treating Mr. Schrock's mental illnesses. *Id*. at 18 (68).

Lastly, Mr. Schrock believes that Defendants IDOC, Wexford, and GEO, committed intentional infliction of emotional distress and battery under Indiana State Law by punishing him for exhibiting symptoms of his mental illness, maintaining that his mental illness is inactive. *Id*. at 18-19 (70); *Id*. at 2 (4).

**A.  The Rehabilitation Act Claim Against IDOC**

To prevail on his claim under § 504 of the Rehabilitation Act and the related Americans with Disabilities Act, Mr. Schrock must show that: (1) he is a qualified person, (2) with a disability, and (3) IDOC denied him access to a program or activity solely because of his disability. *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022). Legal analysis under the two statutes is functionally

---

[3] Although Mr. Schrock discusses it in his briefing, any *Monell* claim against IDOC was dismissed at screening because the IDOC is immune to damages under the Eleventh Amendment. Dkt. 14 at 5-6, dkt. 19 at 1-2.

identical. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). The statutory definition of an "individual with a disability" encompasses a person with "a physical or mental impairment that substantially limits one or more major life activities." *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(A). By definition, "caring for oneself," is a "major life activity." 42 U.S.C. § 12102(2)(A). The Seventh Circuit has recognized that "[s]ome impairments may be disabling for particular individuals but not others, depending on the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of factors." *Nawrot v. CPC Int'l*, 277 F.3d 896, 904 (7th Cir. 2002) (internal citation omitted).

There is no dispute that Mr. Schrock suffers from mental health issues. That said, Mr. Schrock has not established that he has a disability that substantially limits a major life activity. He alleges that his mental illness is a disability because it adversely affects his everyday activities (maintaining proper hygiene, eating, sleeping, maintaining relationships, perceiving others' actions as threats, and functioning normally around others in different environments). Dkt. 68 at 4 (18). Mr. Schrock's mental illness caused him some impairment. However, mental health staff never once found him to be severely mentally ill or experiencing issues of significant functional impairment. Dkt. 107 at 5-6 (citing Dkt. 102-1 at 5, 154). Mr. Schrock vaguely described his issues of impairment as sometimes experiencing difficulty "get[ting] out [of] bed," "tak[ing] care of [him]self" (citing not having showered for a week at his deposition) and having trouble "articulat[ing] [him]self sometimes." Dkt. 102-5 at 107-08 (105-06). While Mr. Schrock's medical records indicate occasional issues with eating, sleeping, shower usage, and energy problems, they were consistently addressed by his mental health providers. Further, Mr. Schrock's vague assertions about these issues are insufficient to show that a major life activity has been substantially impaired. *See Hardwick v. John & Mary E. Kirby Hosp.*, 860 F. Supp. 2d 641, 649 (C.D. Ill. 2012)

(emphasizing that a plaintiff must "provide specific, detailed evidence regarding" an impairment and its effects and that vague generalities are insufficient).

Even if Mr. Schrock's mental health diagnoses did constitute a disability, IDOC did not deny Mr. Schrock access to a program or activity solely because of it. "In prison, qualifying programs and activities include meals, medical care, showers, toilets, and the like." *McDaniel v. Syed*, 115 F.4th 805, 823 (7th Cir. 2024). Mr. Schrock alleges that IDOC used "symptoms of his mental illness/disability as a pretext to keep [him] in segregation." Dkt. 68 at 15 (54). Without providing any details about specific conduct violations, Mr. Schrock alleges that IDOC's lack of mental health treatment caused him to become triggered and his reactions to those triggers resulted in his placement in segregation, where he was isolated and unable to participate in normal activities outside of segregation. Dkt. 102-5 at 182 (180). But he provides no evidence, beyond his speculation, that he was denied access to any programs on account of his disability. Mr. Schrock states that he did not have consistent access to Hebrew Israelite services while housed in segregation. Dkt. 102-5 at 16 (14). But Mr. Schrock acknowledges that the lack of religious offerings was due to the poor functionality of the tablets and Wi-Fi, not because of his mental health issues. *Id.* at 16-17 (14-15). And while Mr. Schrock alleges that he sometimes chose not to shower or maintain proper hygiene because of his mental illness, he does not allege that he was denied access to restroom facilities on account of his illness. There is no evidence from which a reasonable jury could conclude that Mr. Schrock was denied access to a program due to a disability.

Accordingly, no reasonable juror could find that Mr. Schrock has met the elements that he is a qualified person with a disability, who was denied access to a program or activity solely based on a disability and thus, the IDOC is **entitled to summary judgment** on the Rehabilitation Act claim.

### B. *Monell* Claims Against Wexford and GEO

Mr. Schrock's remaining constitutional claims proceed under the theory of liability outlined in *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). The *Monell* doctrine governing municipal liability also applies to private entities. *See Shields v. Illinois Dep't of Corrections,* 746 F.3d 782, 786 (7th Cir. 2014). "*Monell* liability is rare and difficult to establish." *Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022). Mr. Schrock raises two *Monell* claims: (1) that Wexford and GEO maintained a policy, procedure or custom, in part to reduce the cost of care, that resulted in the failure to provide proper mental health treatment and violated his rights; and (2) that Wexford and GEO were deliberately indifferent in failing to adequately train its staff to deal with inmates' mental health needs.

To prevail on a claim against Wexford and GEO, Mr. Schrock must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Wexford or GEO custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). As the Seventh Circuit has explained:

> There are at least three types of municipal action that may give rise to municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. Inaction, too, can give rise to liability in some instances if it reflects a conscious decision not to take action.

*Id*. Wexford and GEO cannot be held liable under the common-law theory of respondeat superior for its employees' actions. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

When alleging a practice or custom claim under category two, a "pivotal requirement" for this type of claim is a showing of widespread constitutional violations. *See Hildreth v. Butler*, 960

F.3d 420, 426 (7th Cir. 2020); *see also Stockton*, 44 F.4th at 617 ("To establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, [the plaintiff] must point to other inmates injured by that practice."). While it is not "impossible" for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, "it is necessarily more difficult . . . because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Hildreth*, 960 F.3d at 426−27 (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)). "If a municipality's action is not facially unconstitutional, the plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Dean*, 18 F.4th at 235. "[C]*onsiderably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Id.* (cleaned up) (emphasis in *Dean*).

A corporation's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To survive summary judgment, Mr. Schrock must provide evidence of a "pattern of similar constitutional violations" or show that the decision not to train prison staff with respect to inmates with medical needs similar to Mr. Schrock's created an obvious risk that a constitutional violation would occur. *Id.* at 62–63 (citing *City of Canton v. Harris*, 489 U.S. 378, 390, n.10 (1989)). In other words, absent a pattern, "a single incident can be enough for liability [only] where a constitutional violation was highly foreseeable." *Miranda v. County of Lake*, 900 F.3d 335, 344 (7th Cir. 2018).

Mr. Schrock acknowledges that because Wexford and GEO do not have an explicit policy about not providing adequate mental health treatment to prisoners, he is alleging a practice or custom claim under category two. Dkt. 102-5 at 130-31 (128-29). Mr. Schrock believes that there

is an unofficial policy by Wexford and GEO to bypass the obligation of treatment and cut costs. *Id*. at 141 (139).

### a. Claims Against Wexford

Mr. Schrock's *Monell* claims against Wexford fail for several reasons.

First, Mr. Schrock has not produced evidence from which a jury could infer that it was deliberately indifferent to his serious mental health needs. "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes that Mr. Schrock's mental health issues constitute a serious medical issue. However, there is no evidence from which a jury can infer that Wexford was deliberately indifferent to his medical needs. The undisputed evidence shows that Mr. Schrock received consistent treatment for his mental health at New Castle, including when he was housed in segregation. During his time in RHU, Mr. Schrock was seen by Wexford staff at least seven times, sometimes with multiple appointments each day, between October 7, 2020, and May 10, 2021. According to medical notes, out of the seven days of appointments that Mr. Schrock received while in the RHU, he only complained once about his mental health treatment on October 21, 2020, after reporting that he was "good" on October 7, and "fine" on October 14. On March 5, 2021, Mr. Schrock, while housed in the RHU, had a mental health exam, and a review of his treatment plan was conducted. Outside of these appointments, no concerns were voiced while Mr. Schrock was

17

in the RHU. On April 30, 2021, (a non-RHU appointment) Mr. Schrock reported that he had concerns of his depression worsening while in segregation.

There is also no evidence that Wexford's employees stopped talking to Mr. Schrock, forced him to go off his medications (or choose between them), prevented him from attaining therapy, or considered his previously diagnosed illnesses as "not active." Mr. Schrock was seen frequently by Wexford employees both while inside and outside of the RHU. He received both Prozac and Remeron under Wexford, a prescription that was never withheld from Mr. Schrock, but that he at times refused. Upon refusal, Wexford staff informed Mr. Schrock that they would discontinue his prescriptions, yet still maintain therapy appointments, if he were to continue to refuse to comply with taking his prescriptions. Dkt. 102-1 at 160-93. Therapy appointments, per policy, were set at a frequency of 90 days, yet Mr. Schrock received therapy appointments at least once per month from October 20, 2020, to June 7, 2021 (except for the month of May). Mr. Schrock was formally diagnosed with and treated for depression and antisocial personality disorder, which were his active diagnoses by Wexford employees. Mr. Schrock self-reported other diagnoses that included PTSD, unspecified personality disorder, major depressive disorder, bipolar disorder, conduct disorder, impulse control, intermittent explosive disorder, and Attention-Deficit/Hyperactivity Disorder (ADHD). *Id*. at 106-118. Regardless of what previous diagnoses Mr. Schrock may have had and which of those were considered to be "active," he was consistently seen and treated by Wexford staff for any issues he was experiencing. Wexford employees' determination of which diagnoses of Mr. Schrock were active or inactive was a decision based on medical judgment. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (noting that a jury may not find deliberate indifference, if the evidence shows that a decision was based on medical judgment, even if other professionals would have handled the situation in a different way).

Mr. Schrock has not produced evidence that Wexford staff acted unreasonably in their medical treatment of him while in segregation (or generally). And while he speculates that Wexford's treatment decisions were motivated by cutting costs, he has produced no evidence of this. His deposition testimony is insufficient because Wexford's financial policies are not "within his personal knowledge." *See McDaniel*, 115 F.4th at 814 (noting that affidavit and similar verified testimony must be considered so long as they were within the plaintiff's "personal knowledge and were otherwise admissible.").

Second, Mr. Schrock has produced no evidence that other inmates with mental illnesses received inadequate care as to show a widespread custom. *Howell*, 987 F.3d at 653.

Finally, to the extent that Mr. Schrock alleges that Wexford or any other defendant is liable for failing to adhere to the IPAS agreement, this is a nonstarter. As explained by the Seventh Circuit, the failure of IDOC to meet IPAS's "agreement's goals is not a constitutional violation" because the IPAS agreement's consent decree does not set the "'constitutional floor' for mental healthcare in prisons." *Scott v. Hinshaw*, 2024 WL 4262804, *3 (7th Cir. Sept. 23, 2024) (unreported) (citing *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022)).

For these reasons, Wexford is **entitled to summary judgment** with respect to Mr. Schrock's failure to provide adequate mental health claim.

Mr. Schrock's failure-to-train claim against Wexford fares no better. As discussed, there is no evidence of a pattern of unconstitutional conduct regarding prisoners being kept on lockup years past their lockup out dates for the purpose of providing inadequate treatment to cut costs. Mr. Schrock has not argued that it was highly foreseeable that the failure to train Wexford staff about this issue would result in a constitutional violation. *See* dkt. 102-5 at 133 (131) (arguing only that Wexford has an unofficial policy of denying adequate mental health to prisoners through

testimony, without additional evidence); *see Mwangangi v. Nielsen*, 48 F.4th 816, 829 (7th Cir. 2022) (noting that under principle of party presentation, parties represented by competent counsel are responsible for advancing the facts and arguments entitling them to relief). Wexford is **entitled to summary judgment** on the failure-to-train claim.

### b. Claims Against GEO

The only evidence Mr. Schrock has submitted in support of this claim against GEO is his testimony that when prisoners are being kept on lock up for substantial periods of time following their lockup out date, GEO staff provides no mental health treatment. Dkt. 102-5 at 47 (45); *Id.* at 203 (201). He stated that he "requested mental health services from the custodial staff at GEO multiple times" and did not receive services, due to inadequate communication between Defendants. Dkt. 114 at 3(2). These unspecified incidents are not enough to support *Monell* liability.

GEO is required to administer correctional control at New Castle. Dkt. 104 at 12. However, GEO does not, nor cannot, control an inmate's placement in or removal from the transition unit (Annex) at the prison. *Id.* Those matters are conducted by the IDOC, blocking GEO from being able to take part in such policies, practices, and customs. *Id.* Thus, GEO did not have any control over the length of time Mr. Schrock (or any other prisoner) spent in segregation, nor how many times he returned.

Nor was GEO responsible for providing medical care. Dkt. 105-5 at 2(h). GEO's role was limited to "ensur[ing] a cooperative environment and unified relationship" with Wexford, *id.*, which it did by responding to grievances about mental health care, dkt. 105-4 at 7. Mr. Schrock submitted only one grievance related to his mental health care, and a GEO staff member responded to the grievance by observing that he was regularly provided mental health services. *Id.* Even if

Mr. Schrock disagrees with the grievance specialist's assessment, this limited interaction is insufficient to demonstrate a widespread practice or policy of failing to ensure that Wexford provided adequate mental healthcare to IDOC inmates. *Howell*, 987 F.3d at 653. Thus, GEO is **entitled to summary judgment** with respect to Mr. Schrock's failure to provide adequate mental health claim.

Mr. Schrock's failure-to-train claim against GEO fares no better. As discussed, there is no evidence of a pattern of unconstitutional conduct regarding a lack of communication between defendants by GEO to prevent mental health care access. Mr. Schrock has not argued that it was highly foreseeable that the failure to train GEO staff about this issue would result in a constitutional violation. *See* dkt. 114 at 3 (2); Dkt. 102-5 at 61 (59) (arguing only that GEO ignored his requests for mental health services and testifying that "GEO staff has to let [him] have access to Wexford. . . staff."); *see Nielsen*, 48 F.4th at 829. GEO is **entitled to summary judgment** on the failure-to-train claim.

### C.  Remaining State Law Claims

The only remaining claims are Mr. Schrock's intentional infliction of emotional distress and battery claims against Defendants. The Court must determine whether it is appropriate to exercise supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367. For the reasons that follow, the Court relinquishes supplemental jurisdiction over these claims and dismisses them without prejudice.

The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction

. . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Seventh Circuit has made clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (internal quotation marks omitted).

The relevant factors weigh in favor of the Court following the "usual practice" in the Seventh Circuit and relinquishing supplemental jurisdiction. *Groce*, 193 F.3d at 501. The statute of limitations will not have run on Mr. Schrock's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances absent here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). The Court has not expended significant resources on the pending state-law claims. And the Court expects that the parties' efforts with

respect to those claims in discovery and briefing will be repurposed in a state-court proceeding. Finally, as always, comity favors allowing state courts to decide issues of state law.

For these reasons, the Court exercises its discretion to **relinquish supplemental jurisdiction** over the remaining state-law claims.

## IV.
## Conclusion

Defendants' motions for summary judgment, dkts. [100], [103] and [106], are **GRANTED** as to all federal claims against IDOC, GEO, and Wexford. The Court relinquishes supplemental jurisdiction over the remaining state claims. The trial scheduled for February 24, 2025, and all deadlines related to trial preparations are **vacated**.

Final judgment consistent with this Order shall issue.

**IT IS SO ORDERED.**

Date: _____ 1/6/2025

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel